Please the court. My name is Vincent Valentino, and I represent the defendant appellant in this case, Matthew Ernst. Your Honors, this case is very fact-driven, and probably the key exhibit in this case is going to be exhibit number one, which is the map that was drawn by the appellee, Melanie Kelsay, in this case. And the reason I say this is the key exhibit is because I don't think Judge Ernst's analysis under the Graham v. Conner Supreme Court ruling on excessive force understood what this map actually represented. And what I'm going to tell you is that on May 29th of 2014, a 9-11 caller at the swimming pool in Wymore, Nebraska, reported a domestic assault involving a Patrick Caslin and a Gage County deputy arrived late to the scene and was advised by a fellow officer that Kelsay had earlier interfered with police as they tried to arrest Mr. Caslin, the man who allegedly was reported to have assaulted her at the pool. There were also, I believe, four children, three of whom belong to Ms. Kelsay, that were at the pool, ranging in ages, I believe, from maybe four or five to 15, the older daughter being a young lady named Madison Kelsay. According to Kelsay's version of the events, she was standing to the west and slightly south of the employee parking lot that is in exhibit number one. There's also a parking lot to the south that she had apparently parked her car in, along with some other women at the pool that reported this incident to the pool manager, who then called 9-11. Rather than what Judge Girard found, she was not in the parking lot. She was 15 feet, by her own testimony, south of the parking lot into the grass area of exhibit number one. The doors to the pool were the witnesses coming out of the pool at the time. Mr. Caslin was in a police car that was in this employee parking lot that is located, actually, to the west of the pool. Ms. Kelsay was, at that time, apparently involved in an argument with the two city of Wymore police officers. One was a chief, the other city assistant officer, that were investigating this, talking to Caslin. Apparently, Mr. Caslin and the officers got into verbal arguments and also physical confrontation. I think the chief was either thrown down or knocked down to the ground. Ms. Kelsay, in the meantime, was apparently voicing her directing various comments to the officers that were trying to do the arrest. The two deputies from Gage County showed up and parked in the employee parking lot somewhere behind the police vehicle from the city of Wymore. In the meantime, the witnesses were coming out of the pool. There were three women that were involved in this, one who passed away before we could depose her. The other one, Monica Sedlicek, is apparently whom Ms. Kelsay felt had instigated the 9-11 call. There was a lot of invective directed apparently at Ms. Sedlicek as she emerged from the pool. Now, the judge, Judge Gerard, when he was looking at this case, said, well, a lot of things are disputed by Ms. Kelsay in this case, but what I'm telling you, it can be gleaned from the record. She was no more than 30 to 35 feet from the pool doors as she began to move to the pool. What she told us in her deposition was that her daughter, Madison, she could hear her screaming or yelling and that she was heading in that direction to find out, and I'll say this, she said some bitch is talking shit to my daughter, is what she testified to, and that she was going to go there and find out what it was. Deputy Ernst was directed apparently by the city officers that she had interfered in the arrest of Mr. Caslen, and she headed in that northeast direction. He tried to get her blocked before she would get to that area where these witnesses were not more than 30, 35 feet away. I have no idea why Judge Gerard came to the conclusion that she was not a threat to anybody at that pool, that she was so far a distance away when she's admittedly, by her own testimony, within 20 to 30 feet of where the pool doors were to the village of Wymore Pool. Needless to say, if one looks at, and she also testified that she felt Ernst behind her. She also testified under oath that he grabbed her hand and said get back here, and that she continued to walk because she thought he wasn't doing anything, and then he, and she admits that he bear-hugged her and took her to the ground, and unfortunately she ended up with a broken collarbone. As a result of it, what, what I want to do to you is, is the district court. Counsel, this, was this on summary judgment or did it proceed to trial? It was on summary judgment. The depositions, the affidavits were all in the record. What Judge Gerard did was, he did, he denied qualified immunity to. Are we required to accept the facts as the plaintiffs? Exactly, and that's what I'm telling you they are. Her own admissions in this case, I'm giving you, I'm not even giving you what, what, what Ernst is saying. I'm not giving you what the independent eyewitnesses that reported this thing are saying. I'm giving you what she said under oath during her deposition, and I'm telling you exhibit number two, which was drawn by her, and, and all the markings on this are hers, is exactly what is the facts from her perspective of this particular case. Why don't you get to the legal issue then? You've spent half the time on the facts, which we've read, but why was it reasonable for him to seize her and use the force that he used, and why, why wasn't that a violation of a clearly established right? Isn't that what it comes down to? Sure, and I'll, let's talk about those ground factors. Number one, the severity of the crime at issue. She, she was later convicted of attempted obstruction of government operations and disturbing the peace. There's no question that she could have been prosecuted for resisting arrest because the officer had a hand on her. She basically wasn't gonna, wasn't gonna allow that to happen. She kept walking in that direction of those witnesses because, as she says in her own testimony, you know, somebody's talking shit to my daughter. I'm gonna, I'm gonna find out what this bitch is saying to my daughter. What was he arresting her for at that point? A resisting arrest. At what point in time did she resist? When she, when she refused to submit to his grabbing her hand and saying, get back here. What was his authority to grab her hand and seize her? Well, because she had interfered in the investigation involving her domestic partner, who was this Patrick Caslin that was at the, inside the police car, and she was 15 feet away from the police car on the grass. And, and, and the city of Wymore... Was trying to arrest her for interfering with the Caslin matter? Yes. Yes. That's what, that's what he had been told to do by the city of Wymore chief of police. That she had been interfering with the arrest of Caslin and, and, and he, and she was directed to stay away from the, the police vehicle that he was in. You say he was trying to arrest her for that. He grabbed her arm to try to seize her and she broke away. Yes. And then you, and then why was it reasonable for him to... He was trying to prevent her from going after these witnesses that had reported her. And why was it reasonable for him to slam her down with, or whatever... With a bear hug? Well, the bear hug is... Well, not the bear hug, the take down... Well, he, he took her to the ground with the bear hug. Why was that reasonable? Because an objective officer under his circum, under the circumstances, as they presented themselves, he was trying to prevent a worse confrontation between her and the witnesses. The record tells us about Miss Kelsey's size. What, what size of, of is the officer? Well, that's, that's actually in an exhibit as well. And it is exhibit number... She photographed him. And you will see him in... Hang on. I hate to waste my time looking for a photograph, but I have it. It's exhibit number seven. He's the last one. I had, we had her list all the officers that were there. We can't see those. Does the record have, does the record have a height, weight, dimension for the officer? No. But if you, I mean, if you look at him, he's, he's slender. I mean, if you look at exhibit seven that I had her list, he's, he's the last one here in the group. He's a, he's a, he's a slender fellow. In any event, the, the Graham factors talk about the severity of the crime at issue. We're talking about resisting arrest. She was convicted... Go ahead. Why was Kaslan in the car again? Because he was reported to have slapped her at the, at the, at the, at the pool. Is this her domestic partner? Yes. Okay. I got it. That's what he was convicted of, event, ultimately in any event. Then the question is whether the suspect poses an immediate threat to the safety of the officer or others. In this case, the objective evidence is that the, the or threats toward the people that had reported her. And under her version of the facts, as she says it, I heard, I heard somebody talking shit to my daughter Madison, and I want to find out what that bitch was saying. That was her, that was her explanation in her, in her deposition, why she was moving in that Northeast direction. The other thing is that whether the suspect is actively resisting or attempting to evade arrest by flight, there's no question she's moving in a Northeast really direction. She admits she's moving in that easterly direction toward the pool doors. There's no question that the witnesses that reported her were in that, were in that area. And there's no question that her daughter was out there, the 15 year old, uh, talking shit or whatever they, whatever she admitted to that she heard screaming. She said her daughter was screaming at, at this Monica Sedlicek. And there's no question that Kelsey herself admitted that she, it was Sedlicek that she thought had reported them to the police that ended up in this situation. So what I would ask the court to do, because this is a fact specific and I'm taking the evidence that's in this record in the most, um, uh, favorable light that's available under the standards. But I also tell this court that after this case was decided, this court decided a series of cases starting with Ellers versus City of Rapid City. That was decided, um, in January of 2017. This case was decided, our case in May of 2017 also decided was, um, Cravener, uh, versus Jasper County, Missouri. Uh, also decided was Hosea versus City of ST Paul, which was a tackling case. Um, is that, is that term is used. Also decided was Vestor versus Hallock, which is an armbar technique and also decided was, um, uh, Brossard versus Yankee. I would, I would just draw this court's attention to the precedent that exists in this circuit regarding cases of similar facts. Ellers being the most, the most important to me. Thank you. I'll reserve the rest of my time for further argument. Thank you counsel. Mr Schiff, excuse me, Ms Schiffer-Miller. Thank you, your honors. May it please the court, counsel. Again, I'm Joy Schiffer-Miller here arguing on behalf of Melanie Kelsey, who also attends the argument here today. Your honors, I think the first thing the court ought to do is look at the fact that my opposing counsel has argued on at least three separate occasion that this is a very fact-driven analysis that one must do to decide to overturn the motion for summary judgment. This comes before the court on the defendant's motion for summary judgment and the the fact that it was denied and it comes up on an interlocutory appeal based on whether or not Mr. Ernst has qualified immunity. And I submit under the case of Aaron versus Shelly, 624 Fed 3rd 882, if the order turns on issues of fact rather than an abstract issue of law, we lack jurisdiction over the appeal because the decision is not a final order immediately appealable under the collateral order doctrine. Schiffer-Miller, what representations of fact did counsel just make that you disagree with or show or that he described inaccurately? Numerous, your honor. First of all, my client is in fact five foot tall, 120 pound woman who was dressed in swimwear with a t-shirt over top and accompanied by three children when she was at the Weimar pool on this evening in question. She was not with her domestic partner. Patrick Caslin was a family friend that was there with her and that is disputed throughout there. I know that Mr. Valentino likes to say that that's a Ms. Kelsey is a married person, that is not her domestic partner. She testified that she was waiting by the pool doors and she was waiting for her husband to come to the pool to talk to the officers about why they had put Mr. Caslin in the back of the the police car. She testified about the fact that, and I believe there is evidence in the record from the other officers too, that it was about 10 minutes that Mr. Caslin had been in the car. She testified that she never interfered with the arrest, that Mr. Caslin was in the car and she went over to the car to ask him what she should do through the open window and when they said step away from the car, she immediately stepped away from the car. So we submit that there's substantial disputes as to material fact, which is what the district court found, and that this case should be set for trial by a fact-finder instead of summary judgment, which is what the district court found. When he just said that the Deputy Ernst tried to block her way, the evidence at the motion for summary judgment demonstrated that Ms. Kelsey actually heard someone talking in a bad way to her daughter and that she started to walk to see what was being said to her daughter and that Mr. Ernst then grabbed her arm and she turned to him and said what and she said I'm going to go talk to my daughter and then turned away and he did not say you're under arrest, he by deposition that she did not feel threatened by my client, that she was just standing there talking to my client's daughter. This was a eight o'clock in the evening swimming pool incident and the court properly found that there were disputes as to material fact and that a fact-finder would have to find what happened. Further, Deputy Ernst testified that he took her to the ground striking her shoulder first, taking her full off her feet in her swimwear and put her shoulder first on the ground and there is no dispute that he in fact broke her shoulder and then they handcuffed her behind her back so tightly that while she was screaming in pain because her shoulder was broken, put her in the back of a police car and drove her from Wymore to the Gage County Sheriff's Department where the jail is and when she got to the Gage County Sheriff's Department while she continued to scream and cry in pain, they asked her what size she needed to wear because they were going to put her in the jail and she said I can't change my clothes because you've broken my arm. These are all facts that are in the record that were apparently, you know, some of it's disputed and some is not disputed but on Ms. Kelsey's part there is a significant dispute as to material fact. Is there any dispute that when the there is a dispute about that. He never told her he was affecting her arrest nor had she done anything that in her mind would cause him to be affecting an arrest at that time. Now he says he was told to arrest her by the police chief. Police chief, thank you, Kirkpatrick. Kirkpatrick actually in his report said he had called off Deputy Ernst and Welch because he'd already put Mr. Kaslan in his car and so he had no further need of them to be there. So when Ernst said he was told to arrest her because of her earlier improper conduct, whatever, with So there are all kinds of factual disputes in this case. Now we we would have likely appealed on some of the other grants of summary judgment but at this point we cannot appeal those issues much like the defendant Ernst cannot appeal this issue because it's factual issues. This is not subject of an interlocutory appeal at all. But in any event, we do believe that the district court made the right decision as it came to Mr. Ernst. I don't know that it is actually in the record how large of a man Mr. Ernst was. It is in fact, there is a picture and there was testimony where they said they were much smaller or much larger persons than Ms. Kelsey. Obviously Ms. Kelsey's five foot and 120 pounds. Did Ernst have testimony in the record about the technique used and the force used in terms of expert testimony showing it was a reasonable technique to use or something of that nature? There was an affidavit, a sworn affidavit, by an expert that they offered into evidence. However, I don't believe that that affidavit even addressed the technique used. I would submit that the bear hug where you take someone down and put them shoulder first into the ground is not a recognized police tactic for taking someone down. It is not a pressure point tactic. Was there a counter affidavit to that effect? There was no counter affidavit to that effect because I don't believe the initial affidavit really even addressed the technique used. It was more that it was proper for him to arrest her because she was creating a commotion of some kind. This is an interlocutory appeal arising from the denial of qualified immunity or asserting qualified immunity, isn't that right? That is true. This wasn't a matter of summary judgment, appealing a motion for summary judgment, was it? I thought you . . . No, Your Honor. What I'm saying is they appealed from the denial of their motion for summary judgment. If I stated that wrong, that's correct. This is not the judge saying that we win. This is the judge saying that we get a trial, right? I don't know. You seem to be saying that this is not even a proper interlocutory appeal, but if we take the facts in the light most favorable to the plaintiff, then there's a purely legal issue presented as to whether those facts would justify an attorney arresting her and using a certain amount of force and whether it's clearly established that such force was forbidden. We have those appeals all the time in Fourth Amendment cases. If it's undisputed that she was not complying with his order, is she entitled to use at least some force to seize her and then we're just down to whether it was clearly established that this amount of force was unreasonable? First of all, it's disputed that he ever made a command to her to stop. Judge Girard seemed to think that was undisputed. He said she had been told to stop but kept walking instead. He's saying those are the facts in light most favorable to her. Well . . . We'll check that. That's true. Go ahead. Why don't you assume for a minute that those are the facts since that's what Judge Girard said they were and he ruled in your favor. Correct. It's a clearly established law that says it's impermissible to take down a person in that situation. Well, Judge Colton, with respect to that, I don't think the defendants or Mr. Ernst has made a showing that there is any . . . I mean, certainly I agree that . . . He cited several cases where we've held if a person is noncompliant, then officers can use some force to bring them into compliance. Sometimes that involves taking the person to the ground. In order to defeat qualified immunity, I think you have to show that it's clearly established that what he did here was a violation of the Fourth Amendment. I'm just asking if you want to address that or have any authority. Well, one of the issues that he relied upon was there is case law on one of the cases that they cited that says you are required as an officer of the law to at least give them a command to stop. In our circumstances, he said it's clearly established, I believe, that Ernst did not give her a command to stop, but he was relying on the other officers to have previously told her that she was going to be arrested. I think as a matter of . . . Mr. Ernst's counsel has not offered up. He's just said that there's all kinds of facts here that Ms. Kelsey could not have possibly been where she says she was. We submit that the District Court made the proper decision in this case and it should go to trial with respect to all of the issues. With that, I would submit it since it's coming up on noon. Mr. Valentino, your rebuttal. Not that this is particularly important, but Mr. Kaslan was convicted of domestic violence to a domestic partner, so it is in the record. I would tell you that whatever Ms. Kelsey's subjective intent or the officer's subjective intent is not relevant and does not drive up this court's decision under Graham. I would also tell you that Ms. Kelsey clearly knew the officer told her to come back. She admitted that and she didn't comply with that directive. I would also tell you that the technique used to take her down was testified to by a former captain and an assistant chief, Mark Sundermeyer, that that is a common tactic that is used by law enforcement to bring somebody to the ground. With that, I would ask this court to use the Ellers v. City of Rapid City, which was a spin takedown maneuver for disobeying the officer as a precedent for this. Thank you. Thank you, Mr. Valentino. Thank you also, Ms. Schiffer-Miller. We'll take your case under advisement and render a decision in due course.